IN THE SUPREME COURT OF THE STATE OF DELAWARE

MARK A. BARTELL, § 
§ 
  Defendant Below, § No. 450, 2023
  Appellant, § 
 § Court Below—Superior Court
  v. § of the State of Delaware
 § 
STATE OF DELAWARE, § Cr. ID No. 1511001595 (K)
 § 
  Appellee. § 

Submitted: September 6, 2024
Decided: November 15, 2024

Before **VALIHURA**, **TRAYNOR**, and **LEGROW**, Justices.

## **ORDER**

(1) The appellant, Mark A. Bartell, has appealed the Superior Court's denial of his motion for postconviction relief under Superior Court Criminal Rule 61. After careful consideration of the parties' briefs and the record, we affirm the Superior Court's judgment.

(2) On November 3, 2015, Molly Bridges[1] reported to police that her husband, Bartell, had sexually assaulted her that morning. Bridges reported that the incident followed a disagreement that had turned physical the night before, during which Bartell had physically assaulted and threatened to kill her. Bartell was arrested and subsequently indicted on two counts of first-degree rape and one count

---

[1] The Court has assigned a pseudonym to the victim under Supreme Court Rule 7(d).

each of fourth-degree rape, terroristic threatening, and offensive touching in connection with those incidents. Later, Bartell was further charged with two counts of second-degree criminal solicitation, based on allegations that while he was incarcerated pending trial, he solicited two other inmates to murder Bridges so that she could not testify against him.

(3) At trial, Bridges testified that she and Bartell were at home on the evening of November 2, 2015, when they got into an argument about ordering pizza and soda. Bartell became enraged; started screaming that he was going to kill Bridges and make it a slow, painful death; and picked Bridges up by the sides of her head and tossed her against the counter. Bartell was more than six feet tall and weighed between 320 and 340 pounds; Bridges was five feet, two inches tall and weighed approximately ninety-two pounds. The next day, Bridges was engaged in her morning routine when Bartell entered her room, threw her on the bed, held her down by pressing the back of her neck, and penetrated her anus and vagina with his penis and fingers, while she squirmed, screamed, and begged him to stop.

(4) After Bridges reported the incident to the police, a sexual assault nurse examiner ("SANE") at Kent General Hospital, Dawn Culp, performed a sexual-assault examination of Bridges. Culp testified that she observed an abrasion near Bridges' left clavicle, redness on the outside of her right knee, and bruises on the inside of her right knee and on her upper right thigh. Culp also testified that she

2

observed redness or tears on various parts of Bridges' genitals and anus. Culp also swabbed areas of Bridges' body for DNA testing.

(5) The defense called Kathleen Brown, Ph.D., as a SANE expert. Dr. Brown, an experienced SANE examiner, professor, and women's health nurse practitioner, reviewed the records from Culp's SANE examination of Bridges. She testified that she did not see any injuries in many of the photographs that Culp took to document her observations of injuries. Dr. Brown testified that, to the extent that she did observe some redness in the photographs, there were many potential explanations other than sexual assault, including constipation, wiping, or a reaction to a hygiene product. Dr. Brown opined that the physical examination was not compatible with Bridges' description of the incident.

(6) A DNA analyst from the Delaware Division of Forensic Science testified that testing of Bridges' rectal swabs indicated the presence of spermatozoa; stains on the comforter from Bridges' bed indicated the presence of spermatozoa and blood; Bridges' vaginal swabs were inconclusive for spermatozoa; and Bridges' oral swabs were negative for spermatozoa. As for DNA testing, certain swabs produced a single-source profile consistent with Bridges' DNA. A stain on the comforter produced a single-source profile consistent with Bartell's DNA. Certain swabs, including two rectal swabs, produced mixed-source profiles indicating at least two individual contributors, at least one of which was male. The analyst testified that

3

the major contributor to those mixtures was consistent with Bridges' DNA profile. As to the minor contributor, the results either did not support a conclusion or Bartell was "excluded," which the analyst testified meant either that Bartell's DNA was not present or the amount of minor-contributor DNA was too low to identify him as a contributor.

(7)     An extract of one of the rectal swabs was then sent to Bode Cellmark Forensics. Christina Nash, a DNA analyst at Bode Cellmark, testified that Bode Cellmark conducted Y-STR testing on the extract. The technique involves amplifying an evidence sample that includes male DNA by making millions of copies of small segments of DNA on the Y chromosome. The DNA profile of those locations on the Y chromosome in the evidence sample can then be compared to the DNA profile of those locations on the Y chromosome in a reference sample. Nash testified that the rectal swab Y-STR profile and the Y-STR profile of Bartell's reference sample were "a match."[2] She elaborated that "23 locations were tested" and "[a]ll locations correlate[d]."[3] Nash testified that the Y-STR profile of the rectal swab was not seen in a database of 5,259 Y-STR profiles.[4] She further testified regarding the statistical weight of the testing, stating that "applying [a] 95 percent

---

[2] *Bartell v. State*, Crim. ID No. 1511001595, Trial Transcript, Mar. 22, 2017, at C-31:18, C-32:8-9 (Del. Super. Ct.).
[3] *Id.* at C-29:21.
[4] *Id.* at C-30:8-15.

4

confidence interval correlates to seeing that Y-STR profile [in] one in 1,757 individuals. So we are 95 percent confident that we would expect to see it once in 1,757 individuals."[5]

(8)     Two witnesses testified that Bartell solicited them to kill Bridges to prevent her from testifying against him. James Hammond was housed on the same tier as Bartell. Hammond testified that he, Bartell, and two other inmates were playing cards together when Bartell said that he would pay any of the others $2,500 to kill Bridges to make the charges go away. Later, Bartell was irate after hearing that Bridges' boyfriend had moved in with her, and he offered Hammond an additional $2,500 to kill Bridges' boyfriend.

(9)     F'Chante Robertson testified that he and Bartell were cellmates for two or three months in pretrial detention. Robertson had been charged with first-degree murder. He testified that Bartell frequently spoke about his charges, saying that he did not rape Bridges and that he wanted to make the case go away by having her murdered. Robertson testified that Bartell offered to help pay Robertson's bail so that Robertson could kill Bridges; Bartell would then sell his house and give half the proceeds to Robertson. Robertson stated that Bartell provided him with a document that included a hand-drawn diagram of Bartell's house and details about Bridges' family, work schedule, and daily routines. Robertson contacted the deputy attorney

---

[5] *Id.* at C-30:20-31:1.

5

general who was handling Bartell's case, reported Bartell's offer, and provided her with the document.

(10) Police tested the diagram for latent fingerprints. They did not find Bartell's fingerprints on the diagram, but they did find Robertson's fingerprints and those of another inmate, Jazzman Wilson. Bridges testified that the diagram was a "pretty accurate" depiction of the home but had some discrepancies, such as a missing bathroom. In addition, the information about Bridges that was included on the diagram was not entirely accurate. For example, the diagram indicated that Bridges worked in the evening on two days of the week when she actually worked in the morning. The defense retained a forensic document examiner to conduct a handwriting examination of the document. Her expert opinion was that Bartell did not write the document.

(11) At the conclusion of the six-day trial, a Superior Court jury found Bartell guilty of fourth-degree rape; two counts of second-degree rape, as lesser-included offenses of first-degree rape; and two counts of criminal solicitation. The jury found Bartell not guilty of terroristic threatening and offensive touching. This Court affirmed Bartell's conviction on direct appeal.[6]

(12) Bartell filed a timely motion for postconviction relief. He requested the appointment of postconviction counsel, which request the Superior Court granted.

---

[6] *Bartell v. State*, 2018 WL 1565636 (Del. Mar. 29, 2018).

Bartell later requested to discharge his counsel and proceed *pro se*, however, and after a colloquy with Bartell, the Superior Court commissioner to whom the postconviction matter was assigned granted his request. The commissioner denied Bartell's subsequent motions for appointment of counsel. After myriad submissions from the parties addressing Bartell's postconviction claims, the commissioner issued a report recommending that the Superior Court deny the motion for postconviction relief. After reviewing Bartell's exceptions, the Superior Court adopted the commissioner's report and denied the motion for postconviction relief.[7] Bartell has appealed to this Court.

(13) This Court reviews the Superior Court's denial of a motion for postconviction relief for abuse of discretion.[8] We review legal or constitutional questions, including claims of ineffective assistance of counsel, *de novo*.[9] The Court considers the procedural requirements of Rule 61 before addressing the substantive issues.[10] Bartell argues on appeal that his counsel was ineffective.[11] Ineffective-assistance claims raised in a timely first postconviction proceeding generally are not procedurally barred.[12]

---

[7] *State v. Bartell*, 2023 WL 7905368 (Del. Super. Ct. Nov. 16, 2023).
[8] *Ploof v. State*, 75 A.3d 811, 820 (Del. 2013).
[9] *Id.*
[10] *Bradley v. State*, 135 A.3d 748, 756-57 (Del. 2016).
[11] As discussed below, some of Bartell's claims have morphed into ineffective-assistance claims on appeal but were not presented as such to the Superior Court.
[12] *Cephas v. State*, 2022 WL 1552149, at *2 (Del. May 17, 2022) (citing *Green v. State*, 238 A.3d 160, 175 (Del. 2020)).

7

(14) Under the "well-worn standards"[13] established in *Strickland v. Washington*, to prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that (i) his defense counsel's representation fell below an objective standard of reasonableness, and (ii) there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different.[14] Although not insurmountable, there is a strong presumption that counsel's representation was professionally reasonable.[15] A defendant must also make and substantiate concrete allegations of actual prejudice to prevail on an ineffective-assistance claim.[16]

(15) Bartell raises several ineffective-assistance claims relating to the DNA evidence presented at trial. He argues that counsel should have challenged the Y-STR evidence by cross-examining Nash or presenting a counter-expert to contest Nash's statements that the rectal swab Y-STR profile "matched" Bartell's Y-STR profile, because Y-STR testing results only in calculation of a "likelihood ratio" that is not the same as a "match." Bartell also contends that various companies use

---

[13] *Ploof*, 75 A.3d at 820.

[14] *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984).

[15] *Albury v. State*, 551 A.2d 53, 59 (Del. 1988).

[16] *Bradley*, 135 A.3d at 760; *see also Ploof*, 75 A.3d at 821 ("To establish prejudice, '[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" (quoting *Strickland*, 466 U.S. at 694) (alteration in original)); *id.* ("'A reasonable probability is a probability sufficient to undermine confidence in the outcome'—a lower standard than 'more likely than not.'" (quoting *Strickland*, 466 U.S. at 693-94)).

different Y-STR methodologies and speculates that Bode Cellmark's methodologies do "not comport with baseline standards;" he asserts that counsel therefore should have objected to the admissibility of the Y-STR evidence or subjected the evidence to further scrutiny by cross-examining Nash or presenting evidence from a counter-expert. Bartell contends that by forgoing those actions, counsel conceded the "intercourse" element of the rape charge.

(16) The Superior Court determined that counsel was not ineffective for not challenging the admissibility of the Y-STR evidence, because Y-STR DNA testing has been widely accepted as scientifically valid in jurisdictions across the United States and in Delaware.[17] The court acknowledged that DNA evidence has been excluded in certain Delaware cases involving much less statistically significant results, such as where there was an approximately 50% chance that the DNA at issue matched the defendant's.[18] Given Nash's testimony that the Y-STR profile would be seen in only one of 1,757 individuals, however, the court concluded that the Y-STR evidence was admissible and that counsel was not ineffective for failing to challenge its admissibility.[19] The Superior Court determined that counsel's decision

_____

[17] *Bartell*, 2023 WL 7905368, at *7. Bartell cites, and includes in his appendix, an *amicus curiae* brief filed in a California case challenging the validity of "STRmix" technology. Amended Appendix to Opening Brief at A-013-69. STRmix is a type of "probabilistic genotype software." *See Hudson v. State*, 312 A.3d 615, 625-29 (Del. 2024) (discussing admissibility of STRmix evidence). Probabilistic genotype software does not appear to have been used in this case.

[18] *Bartell*, 2023 WL 7905368, at *7.

[19] *See id.* (citing *Washington v. State*, 2016 WL 7321711 (Del. Dec. 15, 2016) (holding that Superior Court did not abuse its discretion in admitting DNA evidence that showed that one of

not to cross-examine Nash was consistent with counsel's reasonable strategy to minimize the importance of the DNA evidence in light of Bridges and Bartell's longstanding relationship and Bridges' testimony that they had frequently engaged in vaginal and anal intercourse during their fifteen-year marriage.[20] We agree that Bartell has not overcome the strong presumption that counsel's decisions not to challenge the admissibility of the Y-STR evidence and not to cross-examine Nash were professionally reasonable.

(17) As to Bartell's claim that defense counsel should have retained a "counter-expert," the Superior Court determined that Bartell did not establish prejudice. Bartell does not proffer any evidence to demonstrate how a counter-expert's testimony would have changed the result of the proceeding.[21] To the extent that he contends that a counter-expert would have challenged Nash's characterization of the results as a "match," the jury heard the statistical basis for Nash's conclusion, and it is not reasonably probable that expert testimony merely taking issue with the "match" terminology would change the result. Moreover,

---

every eleven African Americans had a DNA profile matching that of the defendant and of DNA found on a gun), and *Roth v. State*, 2000 WL 970673 (Del. Super. Ct. May 12, 2000) (holding that DNA results were admissible where testimony would have established a probability of 99% or higher that defendant was the contributor).

[20] *Id.* at *8.

[21] *Cf. Flamer v. State*, 585 A.2d 736, 755 (Del. 1990) (holding that defendant did not establish prejudice from alleged deficiencies in counsel's cross-examination of medical examiner because defendant did not provide evidence as to what the witness's answers would have been and Court would not speculate about the answers or how they would have been beneficial to the defense).

10

although the Y-STR evidence had some corroborative value, Bartell and Bridges lived together and had a fifteen-year sexual history, and the presence of Bartell's DNA therefore had only minimal value to corroborate Bridges' account of the incident. And counsel brought Bridges' account into question through cross-examination and by presenting Dr. Brown's testimony that the evidence of Bridges' physical condition during the SANE examination was inconsistent with the history Bridges provided. We agree with the Superior Court's conclusion that Bartell did not establish prejudice arising from the fact that counsel did not retain a DNA expert.

(18) Bartell also argues that defense counsel should have cross-examined or impeached Bridges with (i) evidence implying that Bridges was having an extramarital affair, and (ii) Dr. Brown's conclusion that Bridges' physical examination was inconsistent with her account of the incident. The record reflects that the evidence on which this argument relies *was* presented to the jury, including through the testimony of Bartell's sisters, Dr. Brown, and Bridges. Bartell has not established that counsel's representation was unreasonable, nor has he established prejudice as to this issue.

(19) Next, Bartell contends that counsel did not effectively address three instances when evidence that the court had ruled to be inadmissible was presented to the jury. The first instance occurred during Nurse Culp's testimony on the second day of trial. Before Nurse Culp testified, defense counsel requested that a portion of

11

the medical record from Bridges' SANE examination be redacted and excluded from evidence. The medical record reflected that Bridges had stated to Nurse Culp: "This has happened before, and I should have done something and just left, but I kept going back. He has broke my collarbone, my ribs and my ankle before. And I was seen in New Jersey before, but I stayed, and he has raped me before, too, but nothing like this."[22] After hearing from the prosecution and defense, the court determined that the challenged portion of the medical record was inadmissible under Rule 404(b)[23] and should be redacted.[24] During her testimony, however, Nurse Culp inadvertently referred to an unredacted copy of the medical records and began to read the excluded portion. Defense counsel promptly objected as Culp stated that Bridges had said, "'This has happened before.'"[25] At sidebar, the court sustained the objection and defense counsel agreed that the jury should be instructed to disregard the statement. The court gave the curative instruction.[26]

(20) Bartell asserts that the court's instruction to the jury was insufficient to cure the prejudicial effect of the statement and that counsel was ineffective for failing

---

[22] *State v. Bartell*, Crim. ID No. 1511001595, Transcript of Trial, Mar. 21, 2017, at B-36:16-21 (Del. Super. Ct.) [hereinafter March 21 Transcript].

[23] *See* DEL. UNIF. R. EVID. 404(b) (providing that evidence "of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character" but "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident").

[24] March 21 Transcript, *supra* note 22, at B-36-40.

[25] *Id.* at B-60:2-4.

[26] *Id.* at B-61:23-62:2.

to seek a "more drastic remedy,"[27] such as a mistrial. "We have consistently observed that declaring a mistrial is a remedy of last resort and is mandated only when there are no meaningful practical alternatives to that remedy."[28] And as the Superior Court correctly observed, a trial judge's prompt curative instruction is presumed to cure error and adequately direct the jury to disregard a statement.[29] Because it is highly improbable that the Superior Court would have granted a mistrial had counsel requested one on the basis of the inadvertent reading of Bridges' statement that "this has happened before," it was objectively reasonable for Bartell's counsel to refrain from making the request, and Bartell has not shown prejudice from counsel's decision to rely on the curative instruction.[30]

(21) The other two references to evidence that the Superior Court had deemed inadmissible involved statements indicating that Bridges had obtained a protection from abuse order ("PFA") against Bartell. During the testimony of one of Bartell's sisters, Mary Davis, the State played excerpts of recordings of numerous phone calls between Davis and Bartell while Bartell was incarcerated pretrial. On

---

[27] Opening Brief at 30-31.

[28] *Green v. State*, 238 A.3d 160, 178 (Del. 2020) (internal quotations omitted); *see also id.* (stating that, because the trial judge is in the best position to assess the prejudicial effect of an unsolicited response by a witness, the decision whether to grant a mistrial is committed to the discretion of the trial judge).

[29] *Bartell*, 2023 WL 7905368, at *10; *see also Green*, 238 A.3d at 178 ("And prompt curative instructions are presumed to cure error and adequately direct the jury to disregard statements." (internal quotations omitted)).

[30] *Green*, 238 A.3d at 178.

13

the first day of trial, defense counsel had sought redaction of the phone calls to eliminate references to the PFA. The court ruled that the PFA references were inadmissible under Rule 403[31] and should be redacted.[32] During Davis's testimony, in an answer that was not directly responsive to the prosecutor's question, Davis mentioned that "[t]here was a protection order done."[33] Defense counsel did not object. Later, one of the prison phone calls that the State played referred to a PFA. Defense counsel requested a sidebar, and the prosecutor admitted that the State had inadvertently failed to redact that PFA reference from the recording. The court asked whether defense counsel wanted a curative instruction; defense counsel made a strategic decision not to request an instruction that would highlight the PFA reference to the jury. The copy of the recording that was available to the jury during deliberations was corrected to redact the PFA reference.[34]

(22) In ruling on Bartell's motion for postconviction relief, the Superior Court determined that counsel's decision not to request a curative instruction was a

---

[31] *See* DEL. UNIF. R. EVID. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").

[32] *Bartell v. State*, Crim. ID No. 1511001595, Transcript of Colloquy, Mar. 20, 2017, at 17:9-23:15 (Del. Super. Ct.).

[33] *Bartell v. State*, Crim. ID No. 1511001595, Trial Transcript, Mar. 22, 2017, at C-110:23-111:1 (Del. Super. Ct.).

[34] *Id.* at C-121-23; C-132-36 (Del. Super. Ct.); *Bartell v. State*, Crim. ID No. 1511001595, Trial Transcript, Mar. 23, 2017, at D-77-82 (Del. Super. Ct.).

reasonable strategic decision.[35]  As we stated in Bartell's direct appeal, the PFA references "only vaguely pointed accusatory fingers at Bartell" and were not substantially prejudicial to his defense.[36]  We agree with the Superior Court's determination that reasonable counsel could conclude that a curative instruction would have highlighted the PFA references for the jurors, who might not have understood the references in any event.[37]

(23)  Bartell also argues that counsel inadequately responded to F'Chante Robertson's testimony that Bartell created the document containing the diagram of Bartell's house and the information about Bridges.  He contends that Robertson's testimony that Bartell created the document was false and that counsel should have moved for a mistrial when the State presented the evidence, rather than using the handwriting expert to show that Bartell did not author the document.  It does not appear that Bartell presented this precise argument to the Superior Court.  In any event, we conclude that counsel's representation was objectively reasonable as to

---

[35] *Bartell*, 2023 WL 7905368, at *10.

[36] *Bartell*, 2018 WL 1565636, at *3.  On direct appeal this Court reviewed for plain error Bartell's claim that the Superior Court should have declared a mistrial based on the references to the PFA and to Culp's statement that Bridges reported that Bartell had "done this before."  The Court concluded that Bartell had not "carried his burden of showing that the three inappropriate references, all of which were inadvertent and two of which—the PFA references—only vaguely pointed accusatory fingers at Bartell, resulted in substantial prejudice." *Id.*

[37] *Cf. Smith v. State*, 2021 WL 567703, at *2 (Del. Feb. 15, 2021) (affirming denial of postconviction relief and stating that counsel made a reasonable strategic decision not to object to a witness's spontaneous statement that the defendant was in jail at a particular time or request a curative instruction about the comment because counsel was concerned that doing so would draw additional attention to the comment).

15

this issue. Counsel effectively cross-examined Robertson and other witnesses regarding the document and presented an expert witness who opined that the writing on the diagram was not Bartell's. There was no basis for counsel to move for a mistrial.[38]

(24) Next, Bartell claims that the investigating officer, Officer Simms, told Bartell that he initially did not believe Bridges' allegations. Officer Simms stated at trial that he took notes during his investigation, which he later used to create a police report. Bartell speculates that the notes were "potentially exculpatory" because they might have included an indication that Officer Simms initially did not believe Bridges and asserts that counsel should have requested a missing-evidence instruction[39] as to the officer's notes. Bartell concedes that he did not explicitly

---

[38] Bartell's reliance on *Napue v. Illinois*, 360 U.S. 264 (1959), is unavailing. *Napue* stands for the proposition that the State's knowing use of false or perjured testimony violates due process. *See id.* at 269 ("[A] conviction obtained through the use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." (citations omitted)); *see also Jenkins v. State*, 305 A.2d 610, 616 (Del. 1973) (stating that *Napue* "applies only to the knowing use of false or perjured testimony"). Bartell has not established that the State knowingly used perjured testimony. Rather, whether Robertson's testimony that Bartell created the document at issue was true was a factual question for the jury to determine after considering all the evidence presented on that issue. *Cf. Romeo v. State*, 2011 WL 1877845, at *3 (Del. May 13, 2011) (holding on direct appeal that, although a police detective testified inaccurately, defendant had not shown that the detective made, or the State knowingly used, a false statement in violation of *Napue* because "defense counsel elicited a contrary (and accurate) response on cross examination" of the detective and the jury was presented with a variety of evidence on which to base its factual findings); *Jenkins*, 305 A.2d at 616 ("There is nothing before us to indicate that the State knowingly used perjured testimony. The fact that there were contradictions within Hall's testimony does not require reversal.").

[39] *See generally Lunnon v. State*, 710 A.2d 197, 199 (Del. 1998) ("As a matter of state and federal constitutional due process, the State is required to preserve evidence that may be material to a defendant's guilt or innocence. The remedy for failure to preserve potentially exculpatory

16

couch his argument as an ineffective-assistance claim in the Superior Court but asserts that the Superior Court erred by not construing it as such.

(25) We find no error as to this issue. As an initial matter, the commissioner allowed Bartell to make multiple submissions presenting his postconviction claims, and Bartell identified many of his claims—but not his claim as to the officer's notes—as ineffective-assistance claims. The Superior Court did not err by addressing the claim that Bartell actually raised, rather than the one he now wishes he had raised. Moreover, Bartell's theory that the notes were exculpatory is speculative, and the record developed by postconviction counsel before Bartell elected to proceed *pro se* reflects that the notes were destroyed *after* trial. Thus, counsel was not ineffective for not requesting a missing-evidence instruction at trial.

(26) Bartell's contention that the State failed to produce a latent fingerprint report and Detective Biddle's police reports is at odds with the record. Thus, his argument that the Superior Court should have construed his arguments as to those items as ineffective-assistance claims is unavailing.

(27) Finally, Bartell argues that the Superior Court erroneously permitted postconviction counsel to withdraw. He contends that the ineffective-assistance claim that postconviction counsel wanted to pursue was weaker than those that

---

evidence is a missing evidence instruction commonly referred to as a *Lolly* or *Deberry* instruction. This instruction requires that the jury infer that had the evidence been preserved, it would have been exculpatory to the defendant." (footnotes omitted)).

Bartell himself presented. He asserts, in essence, that the court should have investigated the respective postconviction claims and determined their relative merit before allowing postconviction counsel to withdraw. Before granting the motion to withdraw, the commissioner engaged in a colloquy with Bartell, who stated that he wanted to discharge postconviction counsel and proceed *pro se*. The commissioner informed Bartell that the court would not appoint different counsel and made clear that Bartell would not, by electing to represent himself, gain access to certain information that had been provided to counsel under a protective order. The court did not err by allowing Bartell to represent himself in the postconviction proceedings.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court be AFFIRMED.

BY THE COURT:

*/s/ Gary F. Traynor*
Justice